UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MICHELS PIPELINE, INC., <br> Plaintiff, <br> v. <br> UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO AND ITS AFFILIATED ENTITIES INCLUDING LOCAL 798; DISTRIBUTION CONTRACTORS ASSOCIATION; PIPE LINE CONTRACTORS ASSOCIATION, <br> Defendants. | Court File No. <br><br> **COMPLAINT** |

Plaintiff Michels Pipeline, Inc. ("Michels"), by its attorneys, Littler Mendelson, P.C., as and for its Complaint alleges as follows.

**Parties**

1. Michels is a leading energy and infrastructure contractor that provides a variety of services to its customers including services related to the construction, installation, maintenance, and repair of natural gas transmission pipeline and natural gas distribution pipeline throughout the United States.

2. Michels is a Delaware corporation with its principal place of business and corporate headquarters located at 817 Main Street in Brownsville, Wisconsin. Michels is an "employer" within the meaning of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 152(2), and is engaged in "commerce" or "an industry affecting commerce" within the meaning of 29 U.S.C. §§ 152(6) and (7).

3. The United Association Of Journeymen And Apprentices Of The Plumbing And Pipe Fitting Industry Of The United States And Canada, AFL-CIO ("UA") is a "labor

organization" within the meaning of 29 U.S.C. § 152(5), with its principal place of business and corporate headquarters at Three Park Place, Annapolis, Maryland 21401.  The UA is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of work.

4. UA Local 798 (hereinafter "Local 798") is a "labor organization" within the meaning of 29 U.S.C. § 152(5), that maintains its principal place of business at 4823 South 83rd E. Ave., Tulsa, Oklahoma 74145.  Local 798 is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of work.

5. The Distribution Contractors Association ("DCA") is a trade association that represents distribution contractors in the natural gas and the underground utility industry.  The DCA maintains its principal place of business and corporate headquarters at 101 West Renner Road, Suite 460, Richardson, Texas 75082.  The DCA is an "employer" in or affecting commerce within the meaning of § 152(2) of the LMRA.

6. The Pipe Line Contractors Association ("PLCA") is a trade association that represents companies in the United States oil and gas pipeline construction industry.  The PLCA maintains its principal place of business and corporate headquarters at 3100 Clarendon Boulevard, Suite 620, Arlington, Virginia 22201.  The PLCA is an "employer" in or affecting commerce within the meaning of Section 152(2) of the LMRA.

## Jurisdiction and Venue

7. This is an action for injunctive and declaratory relief and other relief arising out of a violation of contracts between an employer and labor organizations representing employees in

an industry affecting commerce, as defined in Section 301 of the LMRA, 29 U.S.C. § 185, *et seq.* ("Section 301").

8. The Declaratory Judgment Act similarly authorizes federal district courts to, in a case of actual controversy within their jurisdiction, declare the rights and other legal relations of interested parties, where there is jurisdiction conferred by the underlying claims. 28 U.S.C. § 2201.

9. This Court has jurisdiction and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 29 U.S.C. §§ 185(a) and (c), because Local 798's duly authorized officers or agents are engaged in representing or acting for employee members in this District, and because material events giving rise to this suit occurred in this District.

10. This Court has jurisdiction and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 29 U.S.C. §§ 185(a) and (c), because the UA's duly authorized officers or agents are engaged in representing or acting for employee members in this District, and because material events giving rise to this suit occurred in this District.

11. This Court has jurisdiction and venue is proper in this District as to the DCA and PLCA because they are parties to contracts that are at issue in this action covering work performed in this District that forms the basis of this action and because material events giving rise to this suit occurred in this District.

12. The Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with the State of Minnesota, including contacts in furtherance of the dispute and alleged breaches set forth herein.

**Overview of the United States Natural Gas Delivery System**

13. The gas delivery system consists of gathering systems that gather natural gas from well heads or storage facilities and move it into cross-country mainline transmission pipelines. (*See* Declaration of Scott Hunsberger ("Hunsberger Decl.") at ¶ 7).

14. Mainline transmission pipelines transport gas to large-volume users like natural gas power plants and local distribution companies, like utilities, typically utilizing pressure from 500 to 1400 psi. Mainline transmission lines have lateral or branch lines coming off of them to supply local distribution companies, like utilities. (Hunsberger Decl. at ¶ 8).

15. Cross-country mainline transmission pipelines are owned by private natural gas transmission companies or operators and can be compared to the nation's interstate highway for gas. Cross-country mainline transmission pipelines move large amounts of natural gas thousands of miles from the producing regions to the local distribution companies. As a safety measure, these pipelines are designed to handle much more pressure than is ever actually expected to be reached in their system. Typically, pipelines are tested at 1.5 times their maximum allowable operating pressure ("MAOP"). (Hunsberger Decl. at ¶ 9).

16. Local distribution companies, like utilities, are regulated entities within a specific geographic area and link the mainline transmission system by purchasing and regulating natural gas to their consumers, such as residential and commercial customers. (Hunsberger Decl. at ¶ 10).

17. Transmission pipeline operators transfer gas to local distribution companies or local utilities through a final metering station or connection, often referred to as a town border station ("TBS"). At a TBS, the transmission pipeline operator regulates (*i.e.,* reduces the pressure) and meters the amount of gas being delivered to the local distribution company or utility before it enters the local distribution company's system through a valve known as a "City Gate," so that the transmission line operator can control pressure and determine how much to charge the local

distribution company. In some cases, the transmission line operator only meters the natural gas and then the local distribution company regulates the pressure as it enters their system. (Hunsberger Decl. at ¶ 11).

18. The local distribution company or utility may also meter and regulate the gas at the TBS so that it knows how much gas is coming into its distribution system and can verify the amount being charged by the transmission line operator as well as regulate the pressure. (Hunsberger Decl. at ¶ 12).

19. The local distribution company or utility takes possession of the gas from the transmission line operator at the "City Gate," a valve which the distribution company uses to provide a clear demarcation point between transmission and distribution. Many companies often refer to the TBS as a City Gate Station, they are both one in the same. The transmission line operator's responsibility for the gas ends at the City Gate. (Hunsberger Decl. at ¶ 13).

20. Natural gas is odorless. As the natural gas passes through the TBS and enters the distribution system, the local distribution company or utility is required to add odorant to the natural gas to detect leakage. The pressure on the distribution system operated by the local distribution company or utility is reduced from the pressure on the transmission line to meet federal requirements to qualify as a distribution system, before it is regulated (*i.e.,* reduced) again prior to delivery to the local distribution company's customer. (Hunsberger Decl. at ¶ 14).

21. Once the natural gas is metered at the TBS, the only remaining metering is at its final destination, the distribution customer, where once again the local distribution company will know how much to charge their customers. Just as in all phases of the process there is a meter in place to measure the amount of gas being supplied: (1) from the producers to the transmission line

operator; (2) from the transmission line operator to the local distribution company; and finally (3) from the local distribution company to the distribution customer. (Hunsberger Decl. at ¶ 15).

### The National Distribution Pipeline Agreement

22. Michels is a signatory to the National Distribution Pipeline Agreement ("NDPA") between the DCA and the UA. The NDPA is a contract between an employer and labor organizations representing employees in an industry affecting commerce as defined in Section 301. Michaels has performed work under the NDPA since the inception of the NDPA in 1962. (Hunsberger Decl. at ¶ 17, Ex. 2).

23. A map depicting the operation of the gas delivery system, signed by the UA, shows that the demarcation point between transmission and distribution occurs at the TBS. (Hunsberger Decl. at ¶ 16, Ex. 1).

24. The NDPA governs "all gas distribution pipeline construction work" defined as "that portion of the gas distribution system placed in streets, roads, subways, tunnels, viaducts, highways and easements which serves the users of gas," including "gas distribution pipelines within cities, towns, or subdivisions, or suburban areas of within legal easements secured by the utility company for the purpose of containing piping, meters, or any gas appurtenance which would be considered a part of the distribution system." (Hunsberger Decl. at ¶ 18).

25. The NDPA contains distinct grievance and arbitration provisions. (*Id.*)

### The National Pipeline Agreement

26. Michels is a signatory to the National Pipeline Agreement ("NPLA") between the PLCA and the UA. The NPLA is a contract between an employer and labor organizations representing employees in an industry affecting commerce as defined in Section 301 of the NLRA. (Hunsberger Decl. at ¶ 19, Ex. 3).

6

27. The NPLA covers "transportation mainline pipe line work," which is defined as "cross-country pipe lines . . . up to the final metering station or connection." The NPLA defines "final metering station or connection" as "that point where a valve, consumer connection, or town border station divides mainline transmission lines or higher pressure lateral and branch lines from lower pressure distribution systems." The term "consumer" in this definition refers to the transmission line operator's consumer—*e.g.,* a local distribution company. (Hunsberger Decl. at ¶ 20).

28. The NPLA contains distinct grievance and arbitration provisions. (*Id.*)

### The Xcel Energy Projects

29. Michels is contracted by Xcel Energy Inc. ("Xcel")—a public utility holding company—to perform gas distribution pipeline work on two Minnesota projects (collectively, "the Xcel Projects"): (1) Xcel Energy South Washington Natural Gas Phase 1; and (2) Xcel Energy Rice to Hamline 16 Inch County Road B Replacement Phase 3. Xcel's operations include the distribution of natural gas to commercial, industrial, and residential customers in eight states, including Minnesota. (Hunsberger Decl. at ¶ 21).

30. Michels planned and bid the Xcel Projects under the NDPA. (Hunsberger Decl. at ¶ 22).

31. As it relates to the projects at issue, Xcel receives natural gas from a mainline transmission line operated by Northern Natural Gas ("NNG"). Xcel takes possession of the natural gas from NNG at the TBS, where the natural gas then enters Xcel's distribution network for delivery to its distribution customers. After the TBS, NNG—the transmission line operator—does not own or operate any valves or connections on Xcel's distribution lines. (Hunsberger Decl. at ¶ 23).

32. The Phase 3 work involves removing and replacing existing distribution line operated by Xcel within the public right of way. The Phase 1 work involves the installation of distribution pipeline, after which the "replaced" distribution pipeline will be abandoned in place. All of the pipeline work being performed on the Xcel Project is on the public right of way—*i.e.,* not on private property. (Hunsberger Decl. at ¶ 24).

33. As a public utility, in Minnesota, Xcel is regulated by the Minnesota Public Utilities Commission. Before undertaking projects to update existing infrastructure, Xcel is required to obtain regulatory approval because the cost of such improvements is ultimately passed along to rate-payers (*i.e.,* consumers) through increased prices for natural gas. Xcel submitted its request for approval of the Xcel Projects on October 23, 2020. (Hunsberger Decl. at ¶ 25, Ex. 4).

34. Xcel's request states that the Xcel Project involves replacing existing poor performing distribution line under Xcel's Distribution Integrity Management Programs ("DIMP"). The document provides that, with respect to the Xcel Projects, "the company will replace 9.2 miles of distribution pipeline." *Id.*

35. The distribution pipeline being replaced as part of the Xcel Projects is "downstream" from the NNG mainline transmission line and downstream from the TBS. The gas that passes through the pipeline being replaced has had odorant added to it by the local distribution company—Xcel. The Xcel Projects do not involve any work on cross-country pipeline or segments thereof. (Hunsberger Decl. at ¶ 27).

36. The UA has recognized for many years that the TBS is the demarcation point between transmission and distribution. On June 6, 2003, the UA recognized that "Distribution pipeline Jurisdiction begins at the point where the pressure is reduced for final sale to the final consumer, the Town Border Station." (Hunsberger Decl. at ¶ 29, Ex. 5).

37. The UA reiterated this understanding on August 3, 2011, stating that work becomes distribution work when "it passes thru [sic] the final pressure reduction at the Town Border Station whereby it is reduced for sale to the ultimate consumer." (Hunsberger Decl. at ¶ 30, Ex. 6).

38. The distribution pipeline being replaced as part of the Xcel Projects is regulated by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), a division of the U.S. Department of Transportation, as distribution pipeline serving metered customers under 49 CFR § 192. (Hunsberger Decl. at ¶ 31).

39. The Xcel Projects are governed by the NDPA.

**The UA refuses to perform work on the Xcel Projects under the NDPA and the parties file competing grievances under the NDPA and NPLA**

40. On April 13, 2021, pursuant to the NDPA, Michels provided the UA with pre-job notifications for the Xcel Projects, required under the agreement so that the parties jointly understand the circumstances under which the work will be performed and so that the UA can refer appropriate labor for the project. (Hunsberger Decl. at ¶ 32, Ex. 7).

41. On April 14, 2021, the UA responded to Michels' pre-job notification, stating that the work falls under the NPLA. After additional discussions between the parties, on May 7, 2021 the UA notified Michels that it was unwilling to conduct a pre-job conference and refer labor to Michels under the NDPA. (Hunsberger Decl. at ¶ 33).

42. On May 7, 2021, Michels and the DCA filed a grievance against the UA under the NDPA asserting, among other things, that the NDPA governs the Xcel Projects and the UA violated the NDPA by refusing to conduct a pre-job conference and refer labor for the projects (Hunsberger Decl. at ¶ 34, Ex. 8).

43. In response to Michels' grievance, the UA purported to pre-job the Xcel Projects "under protest," and also filed grievances under the NPLA alleging that the work on the Xcel

Projects is covered by the NPLA and Michels' refusal to pre-job the Xcel Projects under the NPLA violated various provisions of the NPLA. The UA did not complete the pre-job in accordance with the NDPA. (Hunsberger Decl. at ¶ 35, Ex. 9).

44. On June 21, 2021, the UA filed an additional grievance against Michels under the NPLA alleging that the work on the Xcel Projects is covered by the NPLA and Michels has violated various provisions of the NPLA. (Hunsberger Decl. at ¶ 36, Ex. 10).

45. On June 23, 2021, Michels responded to the UA, reiterating that the NPLA does not cover the work on the Xcel Projects and, therefore, Michels cannot be in violation of its terms. (Hunsberger Decl. at ¶ 37).

46. Michels has informed the UA and the PLCA that the Xcel Projects are covered under the NDPA and has requested that PLCA suspend its grievance and arbitration process with respect to the grievances filed by the UA. (Hunsberger Decl. at ¶ 38).

47. The PLCA has informed Michels that it will not suspend its grievance and arbitration process with respect to the grievances filed by the UA. (Hunsberger Decl. at ¶ 39).

48. The UA has informed Michels that it intends to pursue arbitration of its grievances under the NPLA, and on July 13, 2021, the UA and PLCA referred its grievances to the Arbitration Board under Article XIX of the NPLA. The Board has 14 days from the date of the referral to adopt procedures for the arbitration. (Hunsberger Decl. at ¶¶ 40-41).

49. Michels has informed the UA that it intends to pursue arbitration of its grievance under the NDPA. (Hunsberger Decl. at ¶ 42).

**COUNT I.  CLAIM FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

50. Michels incorporates and realleges paragraphs 1 through 49 above.

51. There is an actual case or controversy between the parties as to which CBA covers the Xcel Projects and, therefore, which grievance procedure applies—the NDPA or the NPLA.

52. There are a number of grievances pending under two different CBAs, each with its own distinct grievance and arbitration mechanism.

53. Absent judicial intervention, the parties will be forced to proceed with arbitrations under two distinct CBAs, only one of which necessarily controls the dispute.

54. Michels seeks a declaration from this Court that the NDPA and its grievance/arbitration procedures apply to this dispute, and not the grievance and arbitration provisions of the NPLA.

55. Michel's also seeks temporary injunctive relief prohibiting all parties from pursuing grievance and arbitration under either the NPLA or the NDPA, until such time as this Court determines which grievance/arbitration machinery applies to this dispute.

56. Michels will suffer irreparable harm if forced to proceed with the grievances in an improper arbitral forum, which will necessarily occur if both grievances proceed.

57. The balance of harms favors an injunction here because any delay in proceeding to arbitration while the Court determines the proper arbitral forum is outweighed by the certain irreparable harm suffered by a party forced to proceed in an improper arbitral forum that it did not agree to.

58. Michels has established a probability of success on the merits that: (1) it is for the Court, not an arbitrator, to determine whether the parties agreed to arbitrate and, if so, which CBA's grievance procedure applies; and (2) that the NDPA and its grievance/arbitration provisions govern the parties' dispute.

59. Declaratory and injunctive relief is in the public interest because it will preserve party, judicial, and arbitral resources and furthers the overarching policy goals of submitting disputes to arbitration.

60. Michels tenders itself ready and willing to give security as this Court deems proper payment of such costs and damages as may be incurred or suffered by any party or person who is found to have been wrongfully enjoined or restrained

61. Michels seeks and this Court has the authority to issue a temporary restraining order and preliminary injunctive relief pending arbitration pursuant to Section 301(a) of the LMRA.

## COUNT II.  BREACH OF CONTRACT

62. Michels incorporates the allegations in paragraphs 1-49 as if fully set forth herein.

63. Defendants have breached the NDPA by failing to apply its provisions to the work in question and failing to adhere to the grievance and arbitration provisions in that agreement. Defendants have also breached the NPLA by asserting that its provisions apply to this dispute.

64. As a direct and proximate result of Defendants' breaches, Michels has suffered damages, in an amount to be determined at trial.

WHEREFORE, Michels requests that the Court enter an order declaring that:

1. The parties are and will continue to be enjoined from undertaking further grievance and arbitration proceedings under the NDPA or NPLA until after this Court resolves the instant action;

2. The NDPA governs the dispute over the Xcel Projects and the parties must proceed to arbitration under the NDPA;

3. That Michels be awarded damages in an amount to be determined at trial;

4. That Michels be awarded its costs and disbursements herein;

5. That Michels be awarded its reasonable attorneys' fees; and

6. That Michels be awarded such other and further relief as the Court may deem just and proper.

Dated: July 16, 2021

        *s/ Noah G. Lipschultz*
Noah G. Lipschultz, Bar No. 0387308
nlipschultz@littler.com
LITTLER MENDELSON P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone:   612.630.1000

Jonathan O. Levine, Wisconsin Bar No. 1011360
(*pro hac vice to be filed*)
jlevine@littler.com
Michael S. Yellin, Wisconsin Bar No. 1081448
(*pro hac vice to be filed*)
myellin@littler.com
LITTLER MENDELSON, P.C.
111 East Kilbourn Avenue, Suite 1000
Milwaukee,WI  53202
Telephone:  414.291.5536
Facsimile:  414.291.5526
jlevine@littler.com
myellin@littler.com

Attorneys for Plaintiff

4820-3460-9394.1 / 067561-1038